LEFLORE *v.* STATE.

(In Banc. May 28, 1945.)

[22 So. (2d) 368. No. 35788.]

338

G. J. Thornton and David E. Crawley, both of Kosciusko, for appellant.

Greek L. Rice, Attorney General, by R. O. Arrington, Assistant Attorney General, for appellee.

**Smith, J.,** delivered the opinion of the court.

At the September 1943 term of the circuit court of Attala county, appellant, Ned Leflore, was jointly indicted with his sisters, Johnnie D. Leflore and Annie Thornton, for the murder of another negro, Cleveland Guess. A motion for a severance was sustained, and Ned Leflore, on a separate trial, was convicted of manslaughter; whereupon he appealed to this Court. We reversed and remanded the cause for a new trial, because of error in sustaining a motion by the state to permit the jury to view and inspect the scenes of the crime, over the objection of the defendant, because the application therefor was deficient.

In the opinion of the Court in the case referred to supra, Leflore v. State, 196 Miss. 632, 18 So. (2d) 132, 134, occurs the following: ''It is further urged that the proof shows that appellant was not guilty of a crime and should be discharged, but, if not, that the verdict is so against the overwhelming weight of the evidence on the question of guilt that it should not be permitted to stand. We have carefully reviewed and considered this record and cannot agree with these contentions.'' The evidence in that trial, as set out in the opinion, will not be repeated here

except insofar as may be necessary in the discussion of the present appeal. In the former trial the appellant testified; he did not testify in the present trial. His sister, Annie Thornton, indicted with him, did not testify on the former trial before the jury, but did testify in the present case.

Her testimony in the present trial was substantially the same as her testimony on the motion for a new trial before this Court in the record on the former appeal. According to her version, the happenings were strange and eventful scenes, and her version and the version of appellant simply cannot both be true, in our opinion. Her evidence, if believable, would tend to show that appellant did not kill deceased, who, she says, was the victim of two white men, whom she named, under the following circumstances. She and the deceased had been sweethearts for some time, and she had also been bestowing her favors on one of the white men for some time. On the night of the slaying, apparently shortly before two o'clock, she and the deceased were in bed, and these two white men forcibly invaded her home, which was also the home of appellant, in his absence, and upon discovery of deceased in this amatory situation with the witness, proceeded to upbraid him for disregarding a warning to stay away from the witness on pain of death. Deceased, she stated, answered to the effect that they should not bother him as he was with his color. Thereupon, she said, these two white men beat him out of the bed, through her mother's room, out into the backyard, and that she heard a singletree rattling after they had left her room, in which she remained during the attack on the deceased. The next day she said, a blue singletree was missing. They left deceased out in the yard groaning and came back into the house again, where one entered the bed with witness and the other with her sister, departing in about thirty minutes. She then got the clothes of deceased and went out into the yard, where deceased was thrashing around and groaning. She dressed him and left him

there, returned to the house, and presently his groans ceased.

Some little time later the mother of appellant and his brother, with the children of the brother, came to their house, and although having to pass near where deceased was lying, did not see him, or hear him. When they entered, some time before appellant's return home, they were told nothing of the scenes just above detailed, the witness saying that she was afraid to do so in consequence of threats made by these white men. Yet, she and her sister, who did not testify, were then in the privacy of their home and with members of the family on whose fidelity normal people would have relied even in the face of threats, and when the tragedy, if indeed it had then occurred, was strong upon them.

She contradicted herself somewhat when she was testifying as to the arrival of appellant, stating one time that he came into the house, exclaiming he had shot somebody —and another time he came into the house, obtained his pistol, went out, and she heard a shot, and then he came in and said that he had shot somebody. Witness had told appellant nothing about the white men or deceased having been there, and did not then. They, including the sister and the mother, with the aid of a lamp, proceeded, and to the sister's surprise and that of the others, to discover that appellant had shot the deceased. The appellant said: "Wonder what he is doing out here this time of night?" His mother replied "I don't know." His sisters said nothing, so far as the record shows.

The appellant and his two sisters, jointly indicted with him, instead of bringing the body of their allegedly old friend into the house and doing what they could for him, transported him, in a dying condition, to a point by a public road three-quarters of a mile away, and stayed, it was said, by the deceased until he was dead. This road paralleled the Big Black River at that point.

It will be noted that there is no explanation as to how this man, either dead or dying, arose from where he lay

unconscious when this witness dressed him after the departure of the white men, so that appellant could shoot him twice under the circumstances of his confession to the sheriff. The explanation made that this old friend was carried by appellant and his sisters to the roadside across from Big Black River instead of into the house so that he would be accessible to the doctor, is also incredible, since appellant nor anyone else went for the doctor, but remained with the dying man until he died there. Appellant then left, never went to see the doctor on whose place he lived, and was arrested the following night beyond the village of West, apparently a fugitive.

The dead body was found where it was left, by the roadside next morning, by a crew of road workers. They notified the sheriff of the county, who came at once to make an investigation and found the dead body, bruised around the face, bleeding from the mouth and ears, and a bullet wound in the hip, so far as he could tell. He was not a physician or surgeon, and no autopsy was had. The deceased had traces of blue paint in the palm of one hand. The sheriff followed a trail of blood, broken twigs, and disturbed grass up to where it stopped at the home of appellant. He there discovered that the yard had recently been thoroughly cleaned, swept and hoed; blood near the front steps covered with ashes; in the backyard a smouldering fire wherein many things, including clothes, had been burned; and blood-stained blocks of wood hidden in a hollow tree. He had no search warrant or capias and the appellant was not at home or under arrest, being then still at large.

The other sister, present during all of these events, did not testify, nor did appellant; and his version of what occurred is in a voluntary confession made to the sheriff after his arrest. The pertinent parts of appellant's confession are that he had been threatened by a man named Mitchell and had been advised by a justice of the peace to kill him if he came prowling around his home. On the night involved here, he heard someone around his chicken

house, and he obtained his pistol, and shot first into the air to frighten the prowler, who at once started walking away, and then, for no apparent reason whatever, turned and started walking toward appellant who confessed that he then shot him twice and he fell, and he then discovered, as set out, supra, that he had shot his friend. He said he shot him in the face. One shot aperture was identified later by the sheriff in the hip of deceased, and the other shot wound, unless in the face where blood was from the mouth and ears, was not located. The sheriff said he did not look for it. And then the sequence of events leading to the finding of the body is said to have occurred as stated supra, and in the former opinion of this Court. The appellant, as stated, did not testify. He was again convicted of manslaughter, and appealed.

There are two assignments of error here. One, that the verdict is against the overwhelming weight of the evidence. The other, that the court erred in overruling appellant's objection to the testimony of the sheriff as to what he found at the scene of the crime without a search warrant.

There is cited to us in support of the first assignment of error certain decisions of this Court which we do not think are in point, and since we cannot agree with appellant that the conviction of manslaughter in the case is against the overwhelming weight of the evidence, we decline to reverse the lower court on that assignment.

There was one other assignment of error in the present appeal: "The court committed fatal error in admitting the evidence of E. E. Bailey touching and concerning the condition of the premises where the alleged homicide occurred." It will be borne in mind in the consideration of this assignment that immediately upon finding the body of deceased by the roadside, in plain view of passersby on the road, the road hands reported to E. E. Bailey, the sheriff of Attala County, what they had found. The sheriff immediately repaired to the scene, located the body, as reported, and from the body of the dead man it

was manifestly evident that the deceased had been slain by violent means, and, in his investigation, followed the trail from the body to the house, where the killing occurred. It is argued that in doing so, in the absence of a search warrant, he committed an unreasonable search of the premises of appellant, and the evidence of what he found at the house of appellant was inadmissible, since he had no search warrant. There was proof that this was the home of the appellant, but none that he leased or owned the spot where the body was, or how far up the trail his dominion extended.

Article 3, Section 23, of the Constitution of Mississippi is as follows: "The people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized." The question then is: Was this a reasonable search for which no search warrant was required because the Constitution prohibits only unreasonable searches? Moore v. State, 138 Miss. 116, 103 So. 483. It is true the appellant was not at home and was not arrested, but the officer followed this fresh trail which led directly to the home of the appellant, his purpose being, of course, to determine whom to arrest if possible.

Section 2470, Code of 1942, provides that "an officer . . . may arrest any person without warrant, : . . when a person has committed a felony though not in his presence; or when a felony has been committed, and he has reasonable ground to suspect and believe the person proposed to be arrested to have committed it; . . . " This Court said in Pickett v. State, 139 Miss. 529, 104 So. 358, that an officer having knowledge or probable grounds for believing that a felony is being or has been committed, may act without a warrant for arrest and without a search warrant, and arrest for a felony. We cannot see, the opinion of the Court being correct, why

upon such a fresh pursuit as here involved the officer could not have arrested appellant without a warrant had he been at home, or that a search warrant was necessary, since the sheriff had probable cause to believe a felony had been committed. The presence of the officer at the home of appellant was for a lawful purpose and for a lawful reason, and being lawful it could not be unreasonable, and, therefore, did not violate the quoted section of the Constitution of Mississippi. The reason, obviously, why appellant was not arrested was that he had absented himself, not for the lawful mission to see a doctor to treat the deceased, who he knew had died, but for flight. He never tried to see the doctor at all, and he was arrested about two days later near West.

Appellant cites Lancaster v. State, 188 Miss. 374, 195 So. 320, wherein was involved an insufficient affidavit and search warrant as a matter of law, and the search of the premises was not incidental to the arrest of the defendant who had already been arrested and was in jail at the time of the search. The Court accordingly held that the evidence obtained on the premises was not admissible. That case is not in point on the facts there and here, as a comparison will demonstrate. We, therefore, cannot agree that the evidence obtained at the home of appellant on this fresh trail was inadmissible, or that a search warrant was required under the circumstances of this case, or that the search was unreasonable, and, therefore, in our judgment, this assignment of error cannot be sustained.

It follows, therefore, that in our judgment, the action of the court below must be affirmed.

Affirmed.